UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OAK STREET FUNDING, LLC,

    Plaintiff,

v.

LYNN S. INGRAM, PAUL MURPHY and
360 RISK MANAGEMENT, INC.

    Defendants.
    _____/

Case No. 09-12736

HONORABLE STEPHEN J. MURPHY, III

# ORDER GRANTING IN PART AND DENYING IN PART
# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This is an action for breach of contract, conversion, tortious interference with contract, unjust enrichment and accounting. The action is brought by Oak Street Funding, LLC, a Delaware limited liability company, against two individuals, Lynn S. Ingram and Paul Murphy, and their insurance company 360 Risk Management, Inc. ("360"). The matter comes before the Court on defendants' motion for summary judgment. The Court held a hearing on defendants' motion on May 27, 2010. For the reasons stated below, defendants' motion will be granted in part and denied in part.

## FACTS

Prior to November 1, 2005, Defendant Lynn Ingram owned stock in Ponta Castle Ingram Agency, Inc. ("PCI"), a Michigan insurance company. Oak Street Funding loaned $1,900,000 to PCI in July 2007, which loan was secured by all of PCI's assets. PCI defaulted on the loan and, on February 11, 2009, surrendered all of its assets to Oak Street. Oak Street brings this action as successor in interest to PCI.

The Contracts

On or about November 1, 2005, Ingram and PCI entered into several contracts. The parties entered into a Stock Purchase Agreement, under which PCI agreed to purchase all of Ingram's issued and outstanding shares of PCI stock for a purchase price of $65,000. The parties also entered into an employment agreement, ("The Employment Agreement"), which provided in relevant parts:

3.  Payments to Ingram: For the period from January 1, 2006 through December 31, 2007, PCI shall pay Ingram, on bi-weekly payroll, the annual wage of $250,000 per year, less such deductions as may be required by law or authorized by Ingram, plus automobile expenses for two vehicles (including auto insurance) the expenses for such vehicles (but not insurance) not to exceed $25,669 per year); and PCI shall pay such other expenses incurred by Ingram in connection with his duties under this Agreement, including entertainment, travel, auto, and mobile phone, but such other expenses not to exceed $2,500 per month.

4.  Life Insurance: PCI shall pay the premiums on the following policies: policy no. 55946073, John Hancock Insurance, through the policy anniversary date in 2019...

7.  Fringe Benefits, etc. PCI shall pay health insurance premiums for Ingram and his wife and long term disability, life insurance and long term care insurance.

12. Exclusivity. Ingram agrees that he shall not conduct any property/casualty insurance business other than pursuant to the terms of this Agreement.

14. Additional Compensation. In addition, beginning ... January 2008.... and ending (6) years thereafter, PCI shall pay to Ingram the annual wage of $200,000, in biweekly installments... plus automobile expenses in the amount of $12,000 per year for one vehicle, plus automobile insurance for one vehicle, plus such additional expenses as may be approved in advance by PCI for business related purposes, plus the fringe benefits set forth in Section 7...

17. Assignment of Accounts. Ingram hereby assigns and transfers and conveys to PCL, effective on January 1, 2006, all of his right title and interest in and to Ingram's accounts. "Ingram's accounts", as used herein, means accounts originated by Ingram prior to the date of this Agreement.

Ingram also entered into a covenant not to compete (the "Non-Compete Agreement").

Complaint ¶ 18.

Section 4 of the Non-Compete Agreement provides:

4. During the term of the Employment Agreement and for a period of three (3) years after termination of the relationship with PCI, [Ingram] shall not, directly or indirectly, on behalf of [Ingram] or any other person or entity, solicit the personal or commercial property or casualty insurance business of any customer of PCI.

On July 29, 2008, defendant Paul Murphy filed Articles of Incorporation for defendant 360 Risk Management. Murphy Decl.

Defendants have submitted the declaration of Lynn Ingram in support of their motion for summary judgment. Ingram attests that by July, 2008 PCI was in complete financial turmoil and failing to function as a viable insurance agency. Ingram Decl. ¶ 7. By that time, a number of insurance carriers had already terminated or suspended PCI's authority to broker insurance business on their behalf due to PCI's failure to pay delinquent premiums. *Id.* Ingram states that by October 1, 2008, nearly half of PCI's insurance carriers had either cancelled or suspended their brokerage contracts with PCI for nonpayment of premiums, including Safeco, Great American Insurance Group, Travelers Insurance, Philadelphia Insurance Companies, Indiana Insurance, Ohio Casualty, Citizens Insurance, and Burns & Wilcox. *Id.* ¶ 8. By that same date, numerous paying PCI clients had their insurance premiums cancelled as a result of PCI's failure to cover these carrier premiums, including Cherokee County Arts Council, San Benito Stage Company, Creative Ministries, Gaylord Community Productions, and Richmond Community Theater. *Id.* ¶ 9.

On September 16, 2008, PCI management placed a letter on Ingram's desk stating that the company was under investigation by the Insurance Commissioner of the State of Michigan. *Id.* ¶ 11. The investigation, which included a comprehensive financial audit of PCI, was being conducted by the Michigan Department of Labor and Economic Growth's Office of Financial and Insurance Regulation. *Id.*

Ingram attests that in September 2008, PCI failed to pay requested reimbursement of his August 2008 and September 2008 automobile expenses in the amount of $2,000. *Id.* ¶ 13.

Ingram attests that at the time of the September 16, 2008 letter, Ingram's wife was preparing to undergo dialysis for her chronic kidney disease, which PCI was well aware of, and was concerned that her health care coverage would lapse. *Id.* ¶ 16-17. To ensure that Carol's health care coverage would not lapse, on September 26, 2008, Ingram asked PCI president Thomas M. Wolcott to guarantee PCI's payment of the October health care premium by the due date, October 1, 2008. *Id.* ¶ 18. Wolcott responded with a letter dated September 26, 2008, in which he acknowledged that PCI's failure to pay the premiums would likely result in cancellation of the health insurance coverage and a corresponding inability to obtain replacement coverage, but refused to pay the health insurance premiums. *Id.* ¶ 19. Ingram paid the policy premium himself, but was not reimbursed.

In September 2008, PCI also failed to pay Ingram's fourth quarter 2008 life insurance premiums in the amount of $3,469. *Id.* ¶ 20. By September 30, 2008, Ingram's long-term group disability premium was cancelled as a result of PCI's failure to pay the necessary premiums. *Id.* ¶ 22.

Ingram's last bi-weekly payroll check was received from PCI on September 19, 2008; PCI failed on October 3, 2008 to pay Ingram's bi-weekly salary for the weeks of September 22 and September 29, 2008. *Id.* ¶ 21.

On October 8, 2008, Ingram's counsel, Peter Alter, sent a letter to PCI principals Wolcott and Dan Castle addressing PCI's failures to make payments under the Employment Agreement totalling more than $15,000 at that time; PCI never denied the

breaches or responded to the letter. *Id.* ¶ 25. Ingram terminated his employment with PCI on October 10, 2008. *Id.* ¶ 25.

On October 24, 2008, Ingram serviced his first insurance account on behalf of 360 Risk Management. *Id.* ¶ 28. He avers that he did not perform any services or solicit any business for 360 prior to that date. *Id.*

In response, Plaintiffs have filed the affidavit of Daniel Castle, a former shareholder in PCI, and Ingram's former business partner. Castle Aff. ¶ 4. Castle also sold his interest in PCI in July 2007, and started another agency, Mears Insurance Agency. Id. ¶ 3, 5. On March 5, 2009, Castle purchased some books of business from Oak Street that had formerly been owned by PCI. Id. ¶ 6. Castle attests that he was aware as early as April 2008 that PCI was having financial difficulties and that he did not know that "several PCI producers including Ingram and Paul Murphy ("Murphy") were moving accounts from PCI as early as April 2008." Id. ¶ 8. Castle attests that a review of the books, records and computer files made him concerned about the accuracy of those documents, and asserts that "[i]t is clear that the Applied system was compromised and possibly manipulated to avoid leaving a paper trail. *Id.*

Castle states that to move an account from one agency to another required multiple activity entries in the Applied system. Castle Aff. ¶ 8. Castle states that after he acquired the assets of PCI, he "discovered that numerous accounts had left PCI without the proper documentation." *Id.* Castle also attests that he "learned from three former PCI employees that Courtney Joseph," a PCI employee, began working only on accounts belonging to Ingram or Murphy, and that "it was common knowledge at PCI" that Joseph had agreed to be an employee of 360 Risk Management and that she was assisting Ingram and Murphy move business for months. *Id.* Castle states that in May or June 2008 he received from

Joseph an email with an attachment that included a rendering of the 360 Risk Management logo, but when questioned she denied knowing anything about the attachment. *Id.* at 9. Castle also states that he believes that Joseph is currently employed by Ingram, Murphy and 360 Risk Management, and has been informed that another former PCI employee, Greg Winay, had accepted a position with 360 Risk Management and also assisted Ingram and Murphy in moving business from PCI to 360 Risk Management. *Id.*

Exhibits to the Castle affidavit are Agent of Record letters ("AOR Letters") showing that a large number of former PCI clients are currently clients of 360 Risk Management. Castle states that, based on his experience in the industry, "an AOR letter is most often the result of an insurance agent soliciting the business of a particular client and convincing that client to transfer his business to that insurance agent." Castle Aff. ¶ 15. Castle claims that he can conclude based upon this evidence that Ingram and Murphy were soliciting PCI clients to leave PCI prior to Ingram and Murphy leaving PCI in 2008, and that Ingram and Murphy were inducing PCI employees, including Joseph and Winay, to assist them in taking business by offering them employment at 360 Risk Management. Id. ¶ 17.

In support of their reply, and in opposition to the Castle affidavit, defendants submitted a second declaration of Lynn Ingram. The Ingram Second Declaration states that the letters attached to Castle's affidavit discloses only one account previously affiliated with PCI that submitted an AOR letter to its insurer prior to October 24, 2008, Big Boy Restaurants International, LLC ("Big Boy"), and that Big Boy did not transfer its account to 360 Risk Management, but rather to another agency, Cambridge Underwriters. Second Ingram Decl. ¶ 4-5.

**ANALYSIS**

Oak Street's complaint against Ingram, Murphy and 360 Risk Management contains six counts. Count I is an allegation of breach of contract against Ingram, alleging that Ingram breached the terms of the Employment Agreement and the Non-Compete Agreement by having PCI's insurance clients execute the AOR Letters or by otherwise soliciting and removing PCI's book of business. Counts II and III are claims of conversion against Ingram, Murphy and 360 Risk Management, alleging that by soliciting PCI's accounts, Ingram "converted" Oak Street's collateral, and that Murphy and 360 "possessed, concealed and/or aided in the concealment" of Oak Street's collateral, in violation of MCL § 600.299a(1)(b). Count IV is a claim of tortious interference with contract asserted against Murphy and 360. Count V is a claim of unjust enrichment, asserting that Ingram "improperly solicited PCI's insurance clients" and has thereby been unjustly enriched. Count VI is a claim for an accounting.

In lieu of answering, defendants have moved for summary judgment on all counts of the complaint. Defendants argue that Oak Street's claims for breach of contract and tortious interference are barred as a matter of law by PCI's substantial and material breach of contract, that the claims for conversion and aiding and abetting conversion fail as a matter of law because Ingram owed plaintiff no duty beyond his purported contractual obligations, that the unjust enrichment claims fail because there is an express agreement covering the contract at issue, and that the accounting claim fails because no claims exist for which an accounting can be sought.

For the reasons stated below, the Court will grant summary judgment as to plaintiff's claims for conversion, aiding and abetting conversion, and unjust enrichment claims. Summary judgment will be denied at this time as to plaintiff's claims for breach of contract,

tortious interference and accounting claims on the grounds that discovery has not yet been completed.

I.  Is Summary Judgment Appropriate on Oak Street's Breach of Contract Claim on the Grounds that PCI First Substantially Breached the Employment Agreement By Failing To Pay Ingram and Failing to Function As a Viable Insurance Agency?

Defendants argue that Oak Street is barred from suing for breach of contract based on the doctrine of first substantial breach because on the undisputed facts Oak Street committed the first substantial breach of contract.

"He who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform." *Chrysler Int'l Corp. v. Cherokee Export Co.*, 134 F.3d 738, 742 (6th Cir. 1998) (quoting *Ehlinger v. Bodi Lake Lumber Co.*, 324 Mich. 77, 89 (1949)).  The determining factor is whether a breach is substantial. *Id.* A "substantial breach" is one which effects a change in the essential operative elements of the contract, such as a failure of consideration, or something that makes further performance by the other party ineffective or impossible. *Id.* "It is elementary that a failure to make payment pursuant to the terms of the contract constitutes a substantial breach." *Southland Underground C.A.T.V., Inc.*, 1987 U.S. Dist. LEXIS 15683 at * 11 (E.D. Mich. 1987) (citing *Ehlinger*).[1] Defendants argue that PCI first substantially breached the contract

---

[1] Plaintiff argues in response that defendants fail to cite a single case under *Michigan* law in which the doctrine of first substantial breach excused an employee's obligation under a non-competition agreement.  Plaintiff also argues that in *Coates v. Bastian Bros., Inc.*, 276 Mich. App. 498, 511 (2007) the Michigan Court of Appeals refused to apply the doctrine of first breach to bar enforcement of a non-competition agreement and questioned the continuing vitality of the doctrine.  *See Coates*, 276 Mich. App. at 511, n. 1 ("[w]e question the continued vitality of the first breach doctrine under our Supreme Court's contracts jurisprudence...")  The *Coates* case is distinguishable because the non-compete clause at issue in that case stated that the clause applied "regardless of the reason for termination," and therefore the court held that the parties "opted out of the first breach doctrine" by using that language, and the parties are free to avoid by contract otherwise applicable rules of law.  Furthermore, the language about the lack of vitality of the first breach doctrine is dicta.

by failing to function as a viable insurance agency when the insurance carriers began suspending PCI's brokerage authority in July 2008 and subsequently caused repeated failures of consideration by failing to pay Ingram pursuant to the terms of the Employment Agreement, beginning with his automobile expense reimbursement in August 2008.

The Court finds that on the undisputed facts in the record, plaintiff's predecessor in interest committed a substantial breach of the contract as a matter of law prior to the date that Ingram terminated his employment with PCI. Defendants have offered admissible evidence in the form of the Ingram affidavit that tends to prove that plaintiff's predecessor in interest, PCI, was in complete financial turmoil and failing to function as a viable insurance agency by July 2008. Ingram Decl. ¶ 7. By October 1, 2008, nearly half of PCI's insurance carriers had either cancelled or suspended their brokerage contracts with PCI for nonpayment of premiums, including Safeco, Great American Insurance Group, Travelers Insurance, Philadelphia Insurance Companies, Indiana Insurance, Ohio Casualty, Citizens Insurance, and Burns & Wilcox. *Id.* ¶ 8. By that same date, numerous paying PCI clients had their insurance premiums cancelled as a result of PCI's failure to cover these carrier premiums, including Cherokee County Arts Council, San Benito Stage Company, Creative Ministries, Gaylord Community Productions, and Richmond Community Theater. *Id.* ¶ 9. Defendants have also submitted evidence showing that by early October PCI had failed to pay Ingram's salary for several weeks, the Ingrams' health insurance premiums pursuant to Ingram's contract, and had failed to reimburse Ingram for his automobile payments in September, also as required by Ingram's contract. Id., ¶¶ 13-21.

None of these facts have been controverted by the plaintiff. Instead, the plaintiff makes three arguments in response. First, the plaintiff argues that even though PCI breached the contract, there is a material issue of fact as to whether the breaches were substantial, so as to preclude plaintiff from bringing an action for breach. Second, plaintiff

9

asserts that there are material issues of fact as to whether Ingram breached the contract first, by diverting business from PCI prior to the date he officially terminated his employment with PCI on October 10, 2008. Third, plaintiff argues that, at the very least, it is entitled to discovery on the question of when Ingram first began competing with PCI or diverting business from PCI to 360, or whether PCI's breaches were caused in part by such violations on the part of Ingram and/or 360.

Plaintiff first argues that there are material factual issues as to whether the admitted breaches of contract by PCI were "substantial." Oak Street argues that for the first breach doctrine to apply, the breach must be substantial. In order for the breach to be substantial, it must effect such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or preventing the performance by the other party. *Chrysler Intl.*, 134 F.3d at 742; *Baith v. Knapp-Stiles, Inc.*, 380 Mich. 119, 126 (1968). Plaintiff argues that, viewing the facts in the evidence in the light most favorable to the plaintiff, the Court should hold that any breach by PCI did not render ineffective or impossible further performance by Ingram, and that a fair inference of the evidence is that PCI's inability to make payments was the result of defendants' diverting commission money away from PCI and moving accounts. Finally, plaintiff argues that summary judgment is not appropriate because the question of whether a breach is substantial is a question for the jury. *Citing Michaels v. Amway Corp.*, 206 Mich. App. 644, 651 (1994) ("Here, there is an issue of fact concerning whether plaintiffs breached the contract substantially"). Oak Street argues that even if Oak Street missed payments on fringe benefits before Ingram

violated the non-compete agreement, that should not be sufficient for Ingram to completely avoid the non-compete agreement.[2]

Defendants argue that plaintiff's submissions on Murphy and the fact that he transferred his accounts (including Falcon Holdings) cannot create genuine factual issues because Murphy was expressly permitted, according to his independent contractor agreement with PCI, to direct his accounts as he deemed proper. Murphy's contract with PCI stated that "[Murphy] is the owner of all [Murphy's] accounts..." Defendants argue that the plaintiff is attempting to mislead the Court by conflating the activities of Ingram and Murphy and manufacturing a false appearance of wrongdoing, despite the fact that each had a different contract with PCI, and that Murphy was permitted at any time to transfer his accounts, including Falcon Holdings, to 360 Risk Management.

Defendants also argue that Castle's affidavit is based on hearsay, inadmissible, and cannot be used to create a genuine issue of fact. Fed. R. Civ. P. 56(e) requires that any affidavit offered in opposition to summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." "A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of fact." *Sperle v. Michigan Department of Corrections*, 297 F.3d 483, 495 (6th Cir. 2002) (citations omitted).

Castle's affidavit states that he "learned from three former PCI employees" that Courtney Joseph worked only on Ingram and Murphy's accounts, that "[i]t was common knowledge at PCI" that Joseph agreed to be an employee of 360, and that "would explain" how numerous accounts could be transferred without proper paperwork, and that he had "been informed" that Greg Winay had accepted a position with PCI and assisted Ingram

---

[2] Oak Street phrases this argument as Ingram "abscond[ing] with PCI's assets, i.e., Oak Street's collateral.

and Murphy in moving business from PCI and 360. Defendants state that these hearsay allegations cannot be considered by the Court to create a genuine issue of fact.

The Court agrees with the defendants that the Castle affidavit does not create a genuine issue of fact sufficient for the plaintiff to avoid summary judgment. Rule 56 requires that a party opposing a properly supported motion for summary judgment may not rely merely on allegations or denials in its pleadings, but must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Affidavits filed in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). The Castle affidavit does not meet this standard in that it does not set out admissible evidence based on personal knowledge. The Castle affidavit therefore is not sufficient for the plaintiff to avoid summary judgment on Count I of the complaint.

Plaintiff's third argument is that the Court should decline to grant summary judgment on Count I of the Complaint because discovery has not yet commenced and plaintiff is entitled to conduct discovery to obtain facts and to respond to defendants' motion. In support of this argument, Oak Street has submitted a Fed. R. Civ. P. 56(f) affidavit of counsel requesting further discovery "to obtain admissible evidence to prove Oak Street's case." Jacob Aff. The Jacob affidavit states that plaintiff intends to (1) conduct a review of defendants' books and record for business believed to be wrongfully taken by the defendants from PCI (2) to determine the dates on which Ingram, Murphy and 360 first conceived their plan to leave PCI to set up 360; (3) determine the dates on which Ingram, Murphy and 360 first contacted and solicited PCI's customers; (4) depose defendants and their employees to determine how defendants' conduct contributed to PCI's financial difficulties; (5) issue document requests to the Michigan Insurance Department to confirm

and determine the extent to which the defendants violated the Michigan Insurance Commissioner's directive and moved PCI's business after September 16, 2008; and (6) to retain a Certified Fraud Examiner to verify Castle's affidavit in which Castle concludes that the defendants diverted business and commissions from PCI and manipulated PCI's books and records to avoid detection.[3] The issue before the Court, therefore, is whether this Rule 56(f) affidavit entitles the plaintiff to avoid summary judgment so that it might conduct discovery on these matters.

Defendants argue that Oak Street's request for further discovery pursuant to Fed. R. Civ. P. 56(f) should be denied because "the court will reject a Rule 56(f) request if the discovery sought pertains to information already available to the nonmoving party." Moore's Federal Practice ¶ 56.10[8][a] at 56-93 (3d ed. 2009). Defendants also argue that, to justify relief under Rule 56(f), the non-moving party must describe "with some precision the materials he hopes to obtain with further discovery, and exactly how he expects those materials would help him in opposing summary judgment." *Everson v. Leis*, 556 F.3d 484, 493 (6th Cir. 2009) (citations omitted).

"Typically, when the parties have no opportunity for discovery, denying the Rule 56(f) motion and ruling on a summary judgment motion is likely to be an abuse of discretion." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008). No discovery has been conducted as of yet, and the plaintiff has filed a Rule 56(f) affidavit identifying in detail what relevant facts it hopes to uncover in discovery. While some of the information could be

---

[3]The Jacob affidavit states specifically that the plaintiff intends to confirm Castle's "state[ment that] Defendants diverted business and commissions away from PCI and manipulated PCI's books and records to avoid detection." This is a mischaracterization of the Castle affidavit. Castle never states as a matter of fact that the defendants did these things. Rather, Castle observes that there are records missing from the operating system that he purchased from PCI, that "[i]t is clear that the Applied system was compromised and possibly manipulated to avoid leaving a paper trail," and that interference by the defendants could explain these inconsistencies.

obtained by the plaintiff without discovery, it appears to the Court that, under *CenTra*, the plaintiff is entitled to conduct discovery on the issue of whether Ingram actually solicited customers of PCI to leave PCI and join 360 prior to the substantial breaches committed by PCI in September and October 2008. The Court will therefore deny without prejudice defendants' motion for summary judgment on Count I of the Complaint.

II. <u>Are Oak Street's Tortious Interference with Contract Claims Barred Because There Was No Breach By Ingram and Because Murphy and 360 Were Motivated Solely by Legitimate Business Purposes?</u>

Defendants argue that the Court should dismiss Count IV of the complaint, which alleges tortious interference with contract against Murphy and 360 because the plaintiff cannot establish the elements of the claim. The elements of tortious interference with contractual relationship are (1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant. *Wood v. Herdon & Herdon Investigations, Inc.*, 186 Mich. App. 495, 499 (1990). First, defendants argue, that because plaintiffs cannot establish an actionable breach of contract as to Ingram, they cannot establish the elements of tortious interference with contractual relations, one of which is a breach. Second, defendants argue that the undisputed facts show that Murphy and 360 were motivated by legitimate business reasons and therefore any action for tortious interference fails as a matter of law.

Defendants' first argument is disposed of by the Court's decision that the plaintiff is entitled to conduct discovery on the issue of whether Ingram solicited PCI clients prior to PCI's substantial breach of contract. As the Court is denying summary judgment on Count I of the complaint pending completion of discovery, the Court will also deny summary judgment on Count IV of the complaint pending completion of discovery

Defendants also argue that plaintiff cannot establish the third element of tortious interference, a breach without justification. To establish the third element, a claimant must

demonstrate an intentional *per se* wrongful act or a lawful act committed with malice, unjustified in law, for the purposes of invading the contract rights or business relationship of another. Defendants rely on *Urban Assoc., Inc. v. Standex Electronics, Inc.*, 216 Fed. Appx. 495 (6th Cir. 2007) for the proposition that interference is not actionable when the plaintiff's actions are motivated by legitimate business reasons.

In *Tata Consultancy Services v. Systems Intl., Inc.*, 31 F.3d 416 (6th Cir. 1994), a case on point, the Sixth Circuit ruled that, under Michigan law, competition or business justification is not an absolute defense to a claim for tortious interference with contract. *Id.* at 427. This case is binding precedent. Summary judgment is not appropriate therefore on defendants' claim of business justification.

In sum, the Court holds that the plaintiff is entitled to conduct discovery on Count IV of the complaint and therefore will deny summary judgment on Count IV.

III.   Should Plaintiff's Claims for Conversion and Aiding and
       Abetting Conversion Be Dismissed Where Ingram's
       Only Duties to PCI were Contractual?

Counts II and III of the complaint allege claims of conversion against Ingram and aiding and abetting conversion against Murphy and 360 Risk Management. The somewhat creative theory of the plaintiff on these claims is that by stealing the PCI accounts, which were collateral for Oak Street's loan to PCI, Murphy "converted" Oak Street's property. Defendants argue that this theory is an improper blurring of a tort claim of conversion with plaintiff's actual breach of contract claim against Ingram, and should therefore be dismissed. The Court agrees, and will dismiss Counts II and III of the complaint.

Conversion is a tort, not a contractual cause of action. Defendants argue correctly that Michigan courts take precautions to avoid blurring the line between tort and contract principles. See *Huron Tool & Eng'g Co. v. Precision Consulting Serv., Inc.*, 209 Mich. App. 365, 374 (1995) (noting the Michigan Supreme Court's admonition "to avoid confusing

contract and tort law'). Defendants argue that a plaintiff may not simply re-cast a contract claim as a tort claim where the plaintiff essentially seeks to enforce the contractual arrangement. *Rinaldo's Constr. Corp. v. Michigan Bell Telephone, Co.*, 454 Mich. 65, 84 (1997). Where a plaintiff claims only monetary losses stemming from a written contract, the plaintiff is limited to contractual remedies. *Id.*

In *Rinaldo's*, the Michigan Supreme Court held that "the threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation." *Id.* at 84. As stated by the Michigan Court of Appeals, "the sometimes hazy distinction between contract and tort actions is made by applying the following rule: if a relationship exists that would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise it will not." *Ulrich v. Fed. Land Bank of St. Paul*, 192 Mich. App. 194, 199 (1991).

Defendants also rely on *Leger v. Image Data Services*, No. 221615, 2002 WL 1463555 at *6 (Mich. App. 2002) in which the Michigan Court of Appeals held that tort claims cannot arise from alleged contractual duties:

> Here, plaintiff's position at trial was simply that he had a contractual right to more money than was paid to him by defendant. Thus, even if plaintiff succeeded in proving that defendant was obliged to pay him certain sums in contract damages, plaintiff never suggested, let alone proved, that defendant had any obligation to "return" to plaintiff monies that plaintiff had "entrusted" to defendant's care. This was a contract case, not a tort case, and the trial court properly recognized that distinction.

Defendants also cite *Leger* in support of their argument that plaintiff's conversion claim fails because Oak Street has failed to allege any entitlement to the return of specific monies in connection with its conversion claims.

> [P]laintiff argues as if to suggest that any time one party if found to have owed another some money following a protracted dispute, the first has converted the amount owed. Such a scenario, however, is far too broad to be encompassed by the tort of conversion. An action for conversion of money cannot be maintained unless there is an obligation on the part of the defendant to "return" specific monies "entrusted" to his care. *Head v. Phillips Camper Sales & Rental, Inc.*, 234 Mich. App. 94, 111 (1999).

*Leger*, 2002 WL 1463555 at *6.

Defendants argue that *Leger* is indistinguishable from the present case, that Oak Street does not and cannot allege that any funds at issue were earmarked, and therefore plaintiff's claims for conversion and aiding and abetting conversion must be dismissed.

Plaintiff argues in response that it has the right to assert contract and tort claims from its position as a secured creditor. In support, plaintiff cites *Taylor Rental Corp. v. J.I. Case Co.*, 749 F.2d 1526, 1529 (11th Cir. 1985) (security interest in tools and equipment); *Bartlett Milling Co. v. Walnut Grove Auction & Realty Co.*, 665 S.E.2d 478 (N.C. Ct. App. 2008) (security interest in herd) and *Farmers State Bank v. Easton Farmers Elevator*, 457 N.W.2d 763 (Minn. Ct. App. 1990) (security interest in crops). None of these cases involve Michigan law and none are claims in which the alleged "converted" assets are terminable-at-will agreements with third parties.

Defendants argue in response that, contrary to Oak Street's arguments, Oak Street does not "own" PCI insurance accounts, i.e. client relationships, in perpetuity. In the absence of a contractual agreement barring such conduct, free enterprise permits anyone to solicit and service PCI's clients. Defendants also point out that Oak Street has not countered defendants' showing that fungible sums of money are not convertible. Finally, defendants point out that the plaintiff is not asserting its current claims as a secured creditor, but rather is asserting PCI's claims against the defendants in plaintiff's capacity as subrogee.

The Court agrees with defendants that Counts II and III should be dismissed. Plaintiffs have cited no cases in which an action for conversion was maintained based upon a breach of a noncompete agreement. The fact that Oak Street gained its cause of action based upon its status as a secured party does not change this result, since Oak Street, as

subrogee, has no greater rights than PCI, the original holder of the right of action. Summary judgment will therefore be granted on Counts II and III of the complaint.

V. <u>Should Oak Street's Claim for Unjust Enrichment Be Dismissed Because there is an Express Contract Governing the Subject Matter at Issue?</u>

Count V is an equitable claim for unjust enrichment against Ingram. Unjust enrichment is a theory of recovery under which the law will imply a contract where the plaintiff proves (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by defendant. *Belle Isle Grill Corp. v. Detroit*, 256 Mich. App. 463, 478 (2003). A contract will be implied only if there is no express contract covering the same subject matter. *Id.* Defendants argue, and the Court agrees, that because the employment contract and the covenant not to compete expressly contemplate and cover any potential claims against Ingram, Oak Street cannot recover on an implied contract theory of recovery. Summary judgment will therefore be granted on Count V of the complaint.

VI. <u>Should Oak Street's Claim for Accounting Be Dismissed Because All Other Claims Are Subject to Dismissal?</u>

Count VI raises a claim for "accounting" against all defendants. Defendants assert that "accounting is a remedy, rather than a separate cause of action," *Roy v. Michigan Child Care Centers, Inc.*, No. 08-10217, 2009 WL 648496 at *1 (E.D. Mich. Mar. 11, 2009), and is not available absent some independent cause of action. *Id.* Defendants assert that, as demonstrated above, the plaintiff has no independent cause of action and therefore its claim for accounting must also be dismissed.

As summary judgment is not presently appropriate as to Counts III and IV of the complaint, the Court will also not grant summary judgment on Count VI.

**CONCLUSION**

Plaintiff is entitled to conduct discovery on the issues of breach of employment contract, tortious interference and accounting and therefore summary judgment will be denied on those claims without prejudice to another summary judgment motion being brought at the close of discovery. The claims for conversion, aiding and abetting conversion and unjust enrichment, however, fail to state a claim as a matter of law and will be dismissed.

**WHEREFORE** it is hereby **ORDERED** that defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. Defendants' motion for summary judgment is **GRANTED** as to **Counts II, III and V**, and **Counts II, III and V are DISMISSED WITH PREJUDICE**. Defendants' motion for summary judgment is **DENIED WITHOUT PREJUDICE** as to **Counts I, III and VI.**

**SO ORDERED**.

                                           s/Stephen J. Murphy, III
                                           STEPHEN J. MURPHY, III
                                           United States District Judge

Dated: August 10, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 10, 2010, by electronic and/or ordinary mail.

                                           Alissa Greer
                                           Case Manager